A jury found this appellant guilty of rape in the first degree as charged in an indictment that alleged that he, "a male, did engage in sexual intercourse with Melinda Sue Carroll, a female, who was less than twelve years of age, he, the said Johnny Carroll, being 16 years or older, in violation of Section 13A-6-61, of the Code of Alabama." Said section of the Code states in subsection (a)(3) that a male is guilty of rape in the first degree, if "He, being 16 years or older, engages in sexual intercourse with a female who is less than 12 years old." By reason of the then relatively recent effective date of the adoption of the Alabama Criminal Code, the author of the language of the indictment, with commendable prudence, inserted therein that the alleged incident occurred "subsequent to 12:01 A.M., January 1, 1980, the effective date of said Section 13A of the Code of Alabama." *Page 1220 
The case was tried during the week commencing August 17, 1984. The alleged victim was the first witness to testify. She testified that she was twelve and one-half years old at that time and that while she was eleven years old, at a time when her mother, the defendant's wife, was in a hospital, the following occurred in the home where she was living with her father and mother and the two brothers of the witness, on an occasion while she and her father were the only persons in the house:
 "Q. I want you to tell the jury — these folks right here need to hear — exactly what happened while ya'll were in the house by yourself.
 "A. Well, when we went in, I went into the kitchen and I stood and then I went back to the bathroom and my daddy came in.
"Q. Came in where?
 "A. He came into the bathroom with me. Anyway, he took my arm and took me into his room and he started getting undressed, and he wanted me to, too, and I didn't.
"Q. Where were you at when this was happening?
"A. What do you mean: in his house?
"Q. Were you in the bed, standing up, or what?
"A. I was standing up.
"Q. Where was he at; was he standing up, also.
"A. Yes.
 "Q. Did he say anything to you during this period of time?
"A. He told me to start getting undressed.
". . .
"Q. What happened next, Melinda?
 "A. And anyway, he went down to the foot of the bed and he grabbed my shirt and he ripped off a few buttons off of it. And anyway, then he tried having intercourse with me and then he couldn't. So then we went into my brother's room, I think it was; and he tried again and he couldn't. Then we went to my room and he got on the floor and started having intercourse with me. Anyway, he used to hit me.
"Q. I didn't understand that part, Melinda.
 "A. When he hit me; some time but all the times there was a certain way he would hit me. It would make me go blank.
 "Anyway, we went into my room; and anyway he pushed me in the floor and then he tried having intercourse with me; and I kept pulling and he would get mad at me and hit me. And then when we was halfway in between my brother's room and my room, that's where he had intercourse with me.
"Q. Was this in the floor?
"A. Yes, sir.
"Q. Was he on top of you when this happened?
"A. Yes, sir.
 "Q. Did his sexual organs actually penetrate your body — your sexual organs — on that occasion?
"A. Yes, sir."
Dr. Charles R. Adcock, a physician, testified Melinda's aunt brought her to be examined by Dr. Adcock a short time after the alleged incident. His testimony was in material and pertinent part as follows:
 "Q. As part of your examination, did you examine her vagina on that occasion?
"A. Yes, sir.
"Q. What result did you discover upon examination?
 "A. She had a non-virginal. The hymen was non-existant.
 "Q. Could you tell by your examination whether or not she had been penetrated?
"A. She definitely had been penetrated.
 "Q. Did you take a verbal history in regard to this situation from her?
"A. Yes, sir.
 "Q. Was the verbal history related to you consistent with the physical condition of her vagina that existed when you examined her?
"A. Yes, sir. *Page 1221 
 "Q. Doctor, there were no actual bruises or this sort of thing in the vagina area, were there?
"A. No bruises.
 "Q. So there has not been any recent trauma to the area that you could tell?
"A. No recent trauma."
Out of fairness to defendant, it should be stated that he took the stand and testified in emphatic denial of what his daughter had testified. During thorough cross-examination, he apparently never wavered in his unambiguous testimony that he was innocent. Several others testified as to facts and circumstances that are inconsistent with his guilt.
We believe that we have set forth above sufficient evidence to disclose that a jury issue was presented as to defendant's guilt, which, in the absence of any issue as to the weight of the evidence, requires that we determine adversely to defendant his first contention for a reversal, that the evidence was not "sufficient to sustain appellant's conviction of rape in the first degree."
The first witness who testified on call of defendant was Mrs. Linda Sue Carroll Henegar, the mother of the alleged victim and the wife of the defendant at the time of the alleged rape for which defendant was convicted. Some time subsequent thereto and while she was no longer married to defendant, she had married a Mr. Henegar. According to the first part of her testimony, she had separated from defendant during the winter following the alleged rape and was "the complaining witness that signed for the warrant" that initiated the prosecution in the instant case. In the early part of her testimony on direct examination by defendant's attorney, she said:
 "Q. Now, at the time that you made the charge or charges that were based on your statements and affidavits to the Clerk of the Jackson County Circuit Court and District Court in there in that office around the corner, was there any truth to those charges?
 "A. When I first took the warrant out, is that what you are talking about?
"Q. Yes, sir.
"A. Yes.
"Q. What was the truth of those charges at that time?
 "A. The charge that was placed against him for the rape of our daughter; is that what you are talking about?
"Q. Yes.
"A. Yes; it's the truth.
"Q. What is the truth?
"A. The charge is the truth."
Thereupon, the following occurred:
 "MR. DAWSON [Defendant's attorney]: Your Honor, we are going to have to plead surprise on that matter and ask the Court to allow us to go forward with matters on cross examination.
"THE COURT: I will permit you to do so.
 "Q. Mrs. Henegar, thereafter on or about March 1st of this year, did you or did you not say that here is the truth about the alleged charge of rape: `Nothing whatsoever happened to my daughter at the hands of my husband or anyone else. The reason I filed the charge was because I wanted to get the attention of my family and some sympathy and affection from them that I felt like would come if I showed them and told them of an occurrence of an alleged rape and that my daughter had been abused by my husband.'
"Did you say that?
"A. I did.
 "Q. Did you not go on and say: `I did not intend to press any charges about it; but of course, when my family members heard of what I had said happened to my daughter and that my husband did it, they urged me to take proper steps that would have been proper in the case of a rape like I described to them.'
"A. I said that.
 "Q. `This put me in such a position that I could not very well tell them that it had not occurred without them getting mad *Page 1222 
at me so I came to Scottsboro and made the charge as I was urged by my family.'
"A. I stated that."
For several pages thereafter, the witness was questioned by defendant's attorney as to the remainder of the affidavit she acknowledged that she had signed, and said affidavit in full was introduced in evidence as Defendant's Exhibit 1, which is now in the transcript of the proceedings and concludes with the following paragraph:
 "I have requested Mr. Kennamer [One of defendant's two trial attorneys] to keep the statement on file in his office, to discuss it with the District Attorney as needed and to produce for the District Attorney a photocopy of it if the District Attorney requests."
Mr. Kennamer followed Mrs. Henegar, formerly Mrs. Carroll, as a witness for defendant. His testimony was to the effect that Defendant's Exhibit 1 was an exact reproduction of what Mrs. Henegar had stated in Mr. Kennamer's presence, of which Mr. Kennamer had taken notes, dictated a tape of the statement, which his secretary typed and the mother of the alleged victim signed.
In support of appellant's second contention for a reversal, the following is stated in brief of counsel for appellant:
 "During Appellant's direct examination of Stephen Kennamer the following objection was made by the State. We quote:
"`Q: Who was there with him and you at that time?
"`A: I asked Mr. and Mrs. Carroll to leave.
 "`MR. DUKE: Your Honor, I am going to object unless he has got some probative value; if he is doing it for impeachment or supporting witness he called, for what purpose is this?
 "`MR. DAWSON: This is to impeach the testimony of Mrs. Henegar regarding her condition on the day that she says the statement was made and to show those circumstances under which it was made.
 "`THE COURT: He is about to testify what Mr. Hampton said. I will sustain as to that.'"
 "Appellant maintains that he should have been allowed to ask Mr. Kennamer what Mr. Hampton said to impeach Mrs. Henegar's testimony concerning her condition on the day she made the statement to show the circumstances under which it was made. The exception to the hearsay rule which allows this type testimony for a purpose other than to prove the truth of the statement is certainly applicable here."
Appellant's attorney correctly recites the transcript of the proceeding as quoted above, but we are unable to agree that the ruling of the court constituted prejudicial error, as sought to be maintained by appellant's attorney in the concluding two paragraphs of his brief on the issue, as follows:
 "As this Honorable Court can well see from Mr. Dawson's objection he was eliciting this testimony not to prove the truth of Mr. Hampton's statement but to show Mrs. Henegar's condition on the day she made the statement (Defendant's Exhibit 1) and the circumstances thereof. "There can be no argument as to the importance in this trial of Mrs. Henegar's statement, clearing Appellant, to Mr. Kennamer thus showing the importance of allowing testimony that was restricted by the Honorable Trial Court. Appellant respectfully maintains that the sustaining of the above objection on the grounds of hearsay constitutes reversible error."
Perhaps there was no meeting of the minds of the trial judge and the defendant's attorney at the time. Appellant has failed to convince us that the trial court was in error in its ruling. It appears also that probably no injury to defendant resulted from the trial court's ruling, inasmuch as the transcript shows, by the testimony of Mr. Kennamer, that the mentioned Mr. Hampton was "Mr. Kenneth Hampton, who is a legal aid lawyer with his office on Market Street," and Mr. Hampton had told Mr. *Page 1223 
Kennamer "that Mr. and Mrs. Carroll were in his office, and Mrs. Carroll wished to recant her testimony and change her statement and file a new statement with us exonerating Mr. Carroll."
The next issue presented in the brief of appellant's counsel is thus captioned:
 "Whether or not the Trial Court erred in sustaining the State's objection on the grounds of hearsay when the purpose of the testimony was merely to prove that a statement was made and not to prove that the statement was true."
Appellant's attorney makes it clear that the issue is directed at the following part of the testimony of Mr. Larry Glass, a newspaper editor, on redirect examination by defendant's attorney:
 "Q. Mr. Glass, one more question. What, if anything, did Mrs. Henegar say to you regarding any practice or occasion for masturbation involving her daughter, Melinda Sue Carroll?
 "MR. DUKE [State's attorney]: Object to that as being hearsay.
"THE COURT: On this occasion?
 "MR. DAWSON: Yes, sir. I asked the lady about what she had said about these matters.
 "MR. DUKE: I renew my further objection. I believe it's already in the record.
 "THE COURT: I sustain as to that particular question."
Appellant's attorney, in his brief, presents as his only argument in support of this issue, the following short paragraph:
 "Appellant respectfully maintains that the Honorable Trial Court erred in not allowing Mr. Glass to answer this question. Again, as in Argument Two, the testimony of Mr. Glass would not be hearsay since it was given in evidence for the purpose merely of proving that the statement was made, and not to prove the truth of the statement. See McElroy's Alabama Evidence Third Edition, Section 242.01 (1) at 511; Bryant v. Moss, 295 Ala. 339, 329 So.2d 538 (1976)."
We would gladly follow what was said by Judge McElroy, as stated in his valuable treatise, and what was held by the Alabama Supreme Court, per Justice Jones, in the cited case ofBryant v. Moss, which is cited by Judge McElroy in footnote 10, in support of Judge McElroy's conclusion: "Consequently, many statements have been admitted as exceptions to the hearsay rule upon the rationale that such statements were admitted for some purpose other than to prove the truth of the statements." The statement in Bryant v. Moss, supra, at 329 So.2d 541, is as follows:
 "The nephews contend that the letter is hearsay and was only admitted to prove that it was received. Therefore, they contend, it was reversible error for the trial judge to read the letter. If the letter was admitted to prove the truth of any assertions it contained, the nephews' hearsay argument would be valid. However, the significance of the statement in the letter is not the truth of any factual matter asserted but simply the fact that the statement was made. A statement made out of court is not hearsay if it is given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial. 5 Wigmore, Evidence, § 1361; 6, Ibid., § 1770; Motors Ins. Corp. v. Lopez, 217 Ark. 203, 229 S.W.2d 228 (1950). We find that the letter is relevant to this case because Mrs. Moss' guardian is seeking cancellation of a deed to her nephews on the basis of inadequate consideration and undue influence."
Neither that which was said by Judge McElroy, as quoted, nor what was held in Bryant v. Moss, as quoted, is applicable to the statement sought to be introduced in evidence by defendant's attorney, a statement by Mrs. Henegar purportedly made to Mr. Glass, both witnesses called by defendant, which statement was not, it seems, offered "in evidence for the purpose merely of proving that the statement was made" and such purpose was not "otherwise relevant in the case at trial." The trial court ruled correctly in its sustention *Page 1224 
of the State's objection to the particular question asked the witness, Mr. Larry Glass.
By the fourth and final issue presented in appellant's brief, he asks this Court to determine "Whether or not the Trial Court erred in not allowing Appellant to impeach Linda Sue Carroll Henegar by showing a prior inconsistent statement on a material fact." As to this issue, the brief continues with the recital from the transcript of the proceeding during the direct examination of Ms. Hazel McLemore as to a conversation the witness had had with Mrs. Henegar as to what Mrs. Henegar had observed "about her daughter, Melinda Sue, with regard to a practice that's called masturbation" that brought about an objection by the State and a ruling by the trial court on the objection, which we now quote, with the context thereof, from the transcript:
 "Q. Now, in that conversation that Linda Sue Carroll Henegar had with you, what did she tell you, please, ma'am?
"A: Do I have to tell that?
"MR. DUKE: I object to that, Judge.
"THE COURT: Wait just a second. What's your grounds?
"MR. DUKE: No predicate laid for it.
 "THE COURT: Read the question back for me, please, ma'am.
"(Requested portion of record read.)
"THE COURT: I sustain.
 "Q. Mrs. McLemore, in the conversation that you testified that Mrs. Henegar had with you regarding masturbation by her daughter, Melinda Sue, did she tell you this or this in substance —
"MR. DUKE: We object to him leading the witness.
 "THE COURT: Ladies and Gentlemen, I hate to keep sending you out, but we are getting into a point here that needs to be resolved. We will give you about a 10-minute break. We won't send for you for about 10 minutes. Relax and don't discuss the case.
"(JURY NOT PRESENT.)
 "MR. DAWSON: Your Honor, as I recall it, I asked Mrs. Henegar if before the time of the spring of these charges if she had any conversation with any persons of Bridgeport or elsewhere in which she discussed these matters. She denied having had any conversations.
 "THE COURT: Mr. McElroy [unquestionably referring to Judge McElroy of McElroy's Alabama Evidence] says this: If the witness denies having made the prior inconsistent statement, testimony from other witnesses that he made the statement is not admissible.
 "MR. KENNAMER: We are not asking if she made the statement. We are asking what she said.
 "THE COURT: I beg your pardon. You are asking her whether this witness in fact made the statement that she said she didn't make. Ordinarily, under the usual situation if you confront her, you've got two problems. Number 1, the witness, Mrs. Carroll, was not confronted with having made the statement specifically to this person as I recall. Number 2, according to McElroy, when you are proceeding to impeach a surprise witness, that testimony by another witness that she made the inconsistent statement on a prior occasion is not admissible.
 "Let me show you what I am talking about. I want to resolve this because we keep getting into it.
"(Bench conference-off-the record.)
 "THE COURT: Let the record show that the Court sustained the objection of the State to the question propounded to the witness, Hazel McLemore. Counsel advised the Court that he had no further questions of the witness.
"MR. DUKE: We have none.
"(JURY PRESENT.)
 "THE COURT: Ladies and Gentlemen, the Court has sustained the objection to the last question asked the witness McLemore, and counsel have *Page 1225 
indicated they have no further questions of the witness.
 "MR. DAWSON: Your Honor, we would call the defendant, Johnny Carroll."
In the statement of the fourth and final issue in the brief of counsel for appellant, counsel for appellant concedes that defendant was endeavoring "to impeach Linda Sue Carroll Henegar" by showing an inconsistent statement on a material fact. Although defendant's attorney had expressed surprise at some of the testimony of Mrs. Henegar and was given liberal allowance by the trial court in the direct examination of her, the trial court correctly ruled that he could not impeach her by showing by another witness that she had made a statement inconsistent with her testimony on the trial. We repeat what was stated in Randolph v. State, 331 So.2d 766, 770
(Ala.Cr.App.), cert. denied, 331 So.2d 771 (Ala. 1976):
 "The testimony of the two grand jurors as to what Calvin Hurley had testified before the grand jury was inadmissible. The status of Calvin Hurley as a witness furnished no exception to the well established rule that a party cannot impeach his own witness by showing by another witness inconsistent statements by the witness sought to be impeached for the purpose of discrediting his testimony. Gandy v. State, 81 Ala. 68, 1 So. 35; Alabama Power Company v. Hall, 212 Ala. 638, 103 So. 867. . . ."
We determine this issue, as well as the other issues presented in brief of counsel for appellant, adversely to appellant.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.